**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

SEAN V.,

*Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_________________________________/

Case No. 1:25-cv-13870

Patricia T. Morris
United States Magistrate Judge

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 14)**

## I. CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 12) is **DENIED**, the Commissioner of Social Security's motion for summary judgment (ECF No. 14) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

## II. ANALYSIS

### A. Introduction and Procedural History

On December 14, 2022, Plaintiff filed an application for supplemental security income, alleging disability beginning on June 15, 2017. (ECF No. 7-1, PageID.43). On February 6, 2023, Plaintiff also filed an application for child's

insurance benefits alleging the same disability date. (*Id.*). The Commissioner initially denied the application on September 12, 2023, and on reconsideration on April 1, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on February 11, 2025. (*Id.*). The ALJ issued a written decision on February 18, 2025, finding Plaintiff was not disabled. (*Id.* at PageID.43–60). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on October 3, 2025. (*Id.* at PageID.25–27).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on December 2, 2025. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 9). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 12, 14, 15).

**B. Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but

less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

**C. Framework for Disability Determinations**

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 7-1, PageID.60). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since December 27, 2020, the date Plaintiff turned 18. (*Id.* at PageID.45). At step two, the ALJ found the following

severe impairments: Ehlers-Danlos syndrome; obesity; mild asthma; major depressive disorder; bipolar disorder; generalized anxiety disorder; gender dysphoria; dissociative identity disorder; an autism spectrum disorder; attention deficit and hyperactivity disorder (ADHD); post-traumatic stress disorder (PTSD); and insomnia. (*Id.* at PageID.46).

At step three, the ALJ found the impairments, individually or in combination, did not meet or medically equal in severity or duration the criteria of any listing. (*Id.* at PageID.47–50). Next, the ALJ found Plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except for the following limitations. The claimant must alternate to sitting for five minutes after every 30 minutes of standing and the claimant must alternate to sitting for five minutes after every 30 minutes of walking. The claimant can operate hand controls only frequently with the right hand. The claimant requires an assistive device for ambulation. The claimant is limited to frequent overhead reaching and frequent reaching in all other directions with the right upper extremity. The claimant can climb ramps and stairs frequently, but can never climb ladders, ropes, or scaffolds. The claimant can frequently balance, but only occasionally stoop and kneel. The claimant can never crawl. The claimant can never work a[t] unprotected heights, never work around moving mechanical parts, and never work in vibration. The claimant is able to perform simple, routine tasks. The claimant is able to interact frequently with supervisors and coworkers, but only occasionally with the public.

(*Id.* at PageID.50).

At step four, the ALJ found Plaintiff did not have any past relevant work. (*Id.* at PageID.58). However, at step five, the ALJ found other jobs in the national economy Plaintiff could perform. (*Id.* at PageID.59). Specifically, the ALJ found

Plaintiff could perform the requirements of a gauger (58,000 jobs in the national economy), a final assembler (43,000), and a sack repairer (100,000). (*Id.*). The ALJ thus concluded Plaintiff was "not disabled." (*Id.* at PageID.60).

**E. Administrative Record**

Plaintiff raises one issue on appeal. He argues the ALJ erred by failing to properly evaluate a medical opinion. While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issue on appeal.

When Plaintiff was 15 years old (and more than two years prior to being eligible for benefits), he presented to the emergency room for suicidal thoughts with a plan to cut himself. (ECF No. 7-1, PageID.518–37). He presented with depression and anxiety and was assessed as a moderate risk. (*Id.* at PageID.531). Plaintiff was admitted to an inpatient facility for behavioral health management for approximately one week; however, no associated records were included with Plaintiff's medical records. (*Id.* at PageID.536, 802).

Closer to the relevant time period, in May 2020, Plaintiff presented for an initial psychiatric visit with behavioral health nurse practitioner Carolyn Marshall because his prior psychiatrist reportedly stressed him out. (*Id.* at PageID.737). He presented for the initial visit with some anxiety but denied any current symptoms of depression, mood swings, or suicidal thoughts, and reported good sleep and motivation. (*Id.* at PageID.737–38). He reported compliance with medications since

his prior hospitalization and no suicide attempts or self-mutilating behaviors since then. (*Id.* at PageID.738). Besides appearing anxious and having a depressed mood, all other findings upon examination were normal. (*Id.* at PageID.741–42). He was continued on some current medications and educated on the importance of complying with his medications. (*Id.* at PageID.742–43).

Plaintiff continued seeing NP Marshall regularly through January 2021 and reported similar medication compliance and general mood stability. (*Id.* at PageID.743–71). He appears to have a four month gap in appointments at this time. In April 2021, Plaintiff was briefly admitted to a behavioral health unit for suicidal ideations; he then reestablished care with NP Marshall and was doing better on his medications in May and adamantly denied any thoughts of suicide at that time. (*Id.* at PageID.773–74). He followed up with NP Marshall again in July 2021 with similar reports. (*Id.* at PageID.779–784). Thereafter, he did not meet again with NP Marshall until March 2023.

Plaintiff also began seeing a therapist semi-regularly in late 2020 through August 2021. (*Id.* at PageID.799–800). There was a notable gap in appointments in April 2021, when Plaintiff regressed and was briefly admitted to a behavioral health unit. (*Id.*). He then also stopped therapy through March 2023.

In March 2023, Plaintiff was voluntarily psychiatrically hospitalized for worsening depression with suicidal ideation. (*Id.* at PageID.1104). At the time he

had not been attending therapy sessions, psychiatry appointments, or taking any of his prescribed medications for over a year. (*Id.* at PageID.1105). Within three days of being back on medication, Plaintiff reported "doing much better" and wanting to get back to his college classes. (*Id.* at PageID.1134). He was discharged several days later with instructions to take his medications as prescribed and attend his psychiatry and therapy appointments. (*Id.* at PageID.1129).

Plaintiff thereafter restarted attending therapy and psychiatric appointments and taking prescribed medications. (*See id.* at PageID.1323–58). Reports mostly indicated he was doing well overall on his medications, which helped him to level out and remain stable, although he still often appeared anxious. (*E.g.*, *id.* at PageID.1326, 1331, 1339, 1710, 2149–50, 2157, 2167, 2172–75, 2180, 2183, 2186, 2189, 2199, 2207; *contra id.* at PageID.1348 (reporting that stopping prescribed Abilify for two weeks was rough, with an increase in suicidal thoughts, depression, and anxiety); PageID.1827, 1830–31 (presenting to ER with superficial cuts to forearms that required "no medical attention" after stopping Abilify; doctors denied admission for inpatient hospitalization)).

Plaintiff presented to the ER with a plan of cutting himself in January 2024 but was released after evaluation as they did not think he was a threat to himself. (*Id.* at PageID.1629, 1792, 1821). He was doing better several days later at follow-up appointments. (*Id.* at PageID.1629, 1792).

Plaintiff attended a consultative mental health examination in July 2023 with Psychologist Michael Brady. (*Id.* at PageID.1221–24). Plaintiff complained of anxiety and depression that has been present most of his life. (*Id.* at PageID.1221). He also complained of waking in the night sometimes with fears and worries and daily suicidal ideation. (*Id.*). Brady noted that his "[m]ood was depressed" at the evaluation but gave no further information besides that "[t]hroughout the evaluation his emotional reaction appeared depressed." (*Id.* at PageID.1222–23). Sensorium and mental capacity testing was all normal except for two errors in calculating serial sevens backwards from 100. (*Id.* at PageID.1223). Brady concluded Plaintiff met diagnostic criteria for major depressive disorder, generalized anxiety disorder, and gender dysphoria. (*Id.* at PageID.1224). Brady then summarized:

> His ability to relate and interact with others, including coworkers and supervisors, is markedly impaired. His depression and distress could affect his interpersonal relationships in the workplace. His ability to understand, recall, and complete tasks and expectations does not appear to be significantly impaired. His ability to maintain concentration was fair. His ability to withstand the normal stressors associated with a workplace setting is markedly impaired.

(*Id.*). The ALJ found this opinion unpersuasive. (*Id.* at PageID.58).

Other evidence will be discussed below as necessary.

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for

disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i) A licensed or certified psychologist at the independent practice level; or

(ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed

> scope of practice only . . . ;
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency

(paragraph (c)(2) of this section).” *Id.* The SSA will consider several factors when it contemplates “the medical opinion(s) and prior administrative medical findings” in a case. *Id.* § 404.1520c(c).

The first factor is “supportability.” For this factor, “[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.” *Id.* § 404.1520c(c)(1).

The SSA will also consider the “consistency” of the opinion. In essence, “[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.” *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source’s “[r]elationship with the claimant.” *Id.* § 404.1520c(c)(3). This factor includes analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant’s] impairment(s);
>
> (ii) Frequency of examinations. The frequency of [the claimant’s] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant’s] impairment(s);

> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary

requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important

factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize

evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant has] a severe impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by

observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions

> that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

> (i) [D]aily activities;
>
> (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;
>
> (vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . .

benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

**G. Argument and Analysis**

As stated above, Plaintiff argues the ALJ erred by failing to properly evaluate Michael Brady's medical opinion.

As a refresher, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain his or her approach with respect to supportability and consistency when considering a medical opinion. *Id.*

§ 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). Importantly,

> The new regulation substantially reduces the ALJ's obligation to explain the basis for his or her assessment of medical opinions:
>
> > [Source-level articulation.] Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept.

28, 2023) (quoting 20 C.F.R. § 404.1520c(b)(1)); *see also Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. 2022) ("Even for a medical opinion, there is no requirement to cite to every piece of evidence or conclusion.").

Plaintiff argues the ALJ's reasoning, block-quoted below, inadequately discussed the supportability and consistency factors in rejecting Brady's opinion:

> Outside of the treatment record, the findings from a consultative mental health evaluation are also inconsistent with the level of limitation alleged by the claimant. The claimant met with Michael Brady, Ph. D., in July 2023, while reporting depression, anxiety, poor memory, and poor concentration. Clinically, the claimant was cooperative with normal dress/grooming, motor activity, speech, thought processes, behavior, and reality testing, albeit the claimant appeared depressed. Mental status testing was generally unremarkable in terms of immediate, recent, and remote recall, fund of knowledge, and abstract thinking. The claimant completed correctly solved arithmetic problems and completed eight iterations of a serial three subtraction task, but made two errors while attempting a serial seven subtraction task. Based on this evaluation, Dr. Brady determined the claimant has major depressive disorder, generalized anxiety disorder, and gender dysphoria.
>
> . . .
>
> Finally, there is a medical opinion from the consulting examiner, Dr. Brady, that this decision finds unpersuasive. Following his evaluation, Dr. Brady opined that the claimant's ability to understand, recall, and complete tasks did not appear limited, the claimant's ability to maintain concentration was "fair," and the claimant was "markedly impaired" in interacting with others and withstanding normal work stressors. This report is not persuasive, in part, because it is not particularly well-supported given that Dr. Brady's clinical findings were almost entirely normal aside from a non-detailed claim that the claimant "appeared depressed" and struggled on a serial seven subtraction task. The

> marked limitations reported are also at odds with other evidence, particularly the claimant's reports regarding the efficacy of treatment in spite of some long gaps in follow-up and failure to take medications for prolonged periods and the claimant's extensive activities reported in this case, including reports of attending college on campus for a period, maintaining significant romantic relationships, engaging in other activities in public settings (e.g., going to the zoo, going bowling), and reports of significant social media activities—describing this, at one point, as a possible career while attending college.

(ECF No. 7-1, PageID.56–58 (internal record citations omitted)).

Plaintiff first argues the "ALJ's conclusion that Dr. Brady's opinion is not consistent with '[Plaintiff's] reports regarding the efficacy of treatment in spite of some long gaps in follow-up' is not supported by the medical record." (ECF No. 12, PageID.2586). Plaintiff then cites his two inpatient hospitalizations and two other times he appeared at the emergency department with suicidal ideations and argues those are highly consistent with Brady's opinion. (*Id.* at PageID.2586–87).

Plaintiff then cites *Kelli S. v. Commissioner of Social Security*, No. 25-cv-10724, 2026 WL 579621 (E.D. Mich. Mar. 2, 2026), in support of his argument. But this case is distinguishable. In *Kelli*, the ALJ discounted a medical opinion, explaining *only* that "[a]lthough the claimant reported significant social limitations, she has been able to interact appropriately with treatment providers and examiners, making good eye contact and behaving cooperatively." *Id.* at *4. More specifically, the ALJ never identified evidence that was inconsistent with the examiner's conclusions. *Id.* at *5–*6. Here, however, the ALJ gave a more detailed explanation

of his finding of unpersuasiveness, allowing the Court to meaningfully review the decision.

Plaintiff argues the ALJ's failure to specifically cite to the record in his discussion of Brady's opinion is fatal. But even *Kelli* acknowledges that the ALJ's decision should be read as a whole; the ALJ in that case just failed to adequately explain his decision anywhere. *Id.* at *6. Not so here. Although the medical evidence describes two hospitalizations since 2018 and two other visits which did not result in admissions, the ALJ adequately explained that the evidence generally showed Plaintiff was stable while on his prescribed medications. (*See, e.g.*, ECF No. 7-1, PageID.55 ("[Plaintiff] did have one hospitalization documented over the last five years, but it occurred after there had been no documented mental health treatment for more than a year and [Plaintiff] reported relatively quick improvement after resuming treatment.")). The ALJ also acknowledged that even while Plaintiff received treatment there were some fluctuations in anxiety and depression throughout his care. (*Id.* at PageID.56). But *the bulk* of the records "indicate[d Plaintiff] responded well to treatment" with repeated reports of improving and stabilizing moods and anxiety levels. (*Id.*). This is a classic example of the ALJ weighing the medical evidence and an improper invitation for the Court to reweigh the evidence, which it may not do. *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. 2022). Substantial evidence supports the ALJ's

finding that Plaintiff's treatment was generally effective, which was inconsistent with Brady's opinion of marked limitations.

Plaintiff then argues the ALJ improperly relied on his activities of daily living in rejecting Brady's opinion that he was markedly impaired in his ability to interact with and relate to others. More specifically, Plaintiff argues the ALJ's reference to "attending college on campus for a period" is misleading as he withdrew from college due to his health. (ECF No. 12, PageID.2589). He then cites to the record to show his withdrawal is consistent with Brady's opinion.

But Plaintiff overstates both what the record says and what the ALJ used this information for. The ALJ merely used this evidence to discount Brady's opinion that Plaintiff had marked social limitations. This is a proper use of the fact that Plaintiff attended college while living on campus *for a time*. The ALJ reasonably concluded that Plaintiff's ability to live on a college campus and attend classes shows that he is not markedly limited in interacting with others. Nor does the record support that Plaintiff withdrew for any reason related to his inability to interact with others, although he tries to frame the facts that way. (*Id.*). The record instead bears out that he withdrew from college for physical issues he was having (and which he does not appeal here). (*See* ECF No. 7-1, PageID.95 ("I medically withdrew because I couldn't keep up with it with my physical health. I was in too much pain just all the time."); PageID.1133–34 (hospital records indicating Plaintiff wants to go back

to school); PageID.1839 ("[Plaintiff] reported that he dropped out if [sic] college recently due to his [Ehlers-Danlos Syndrome]."); PageID.2210 ("[Plaintiff] ha[s] not completed college due to worsening physical health.")).

It was appropriate for the ALJ to rely on Plaintiff's college attendance for a period to support a finding that Plaintiff was not markedly limited in interacting with others. *See, e.g.*, *Simpson v. Comm'r of Soc. Sec.*, No. 14-cv-74420, 2016 WL 74420, at *10 (S.D. Ohio Jan. 6, 2016) ("Evidence showing that plaintiff attended movies with family and friends, visited friends, participated in fundraising for school, dined out, performed household chores such as cooking and vacuuming, drove on a daily basis, went shopping, and traveled significant distances for vacation casts doubt on her assertions of debilitating pain and mental impairments."), *report and recommendation adopted*, 2016 WL 1223007 (S.D. Ohio Mar. 29, 2017). In addition, the ALJ relied on other substantial evidence in concluding Brady's marked limitations were not persuasive, including romantic relationships, extensive social media activities, and other activities Plaintiff engaged in in public settings. Plaintiff has therefore failed to show the ALJ erred and his decision will be upheld.

## III. ORDER

For these reasons, Plaintiff's motion (ECF No. 12) is **DENIED**, the Commissioner's motion (ECF No. 14) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: August 20, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge